IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION



FILED IN OPEN COURT
JUN 20 2024
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:24-CR-132 |
| JAVONTE R. SMALLWOOD | |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, Javonte R. Smallwood, agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

1) From at least in and around December 2022, and continuing thereafter up to and including at least May of 2023, the exact dates being unknown, in Fairfax County, Virginia, within the Eastern District of Virginia, and elsewhere, the defendant did knowingly and intentionally combine, conspire, confederate, and agree with Robert Theodore Sanford Jr. (hereinafter "Sanford") and others, both known and unknown, to distribute:

   a) a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, a Schedule II controlled substance;

   b) a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; and

   c) a mixture and substance containing detectable amounts of Buprenorphine and Naloxone, pharmaceutically produced as Suboxone, a Schedule III controlled substance.

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846.

2) Further, on multiple occasions, including April 13, 2023, at the Fairfax County Adult Detention Center, in the Eastern District of Virginia, the defendant, JAVONTE R. SMALLWOOD, an inmate of the Fairfax County Adult Detention Center, a prison, institution, and facility in which persons are held in custody by direction of and pursuant to a contract and agreement with the Attorney General, possessed prohibited objects, including fentanyl and Suboxone, both narcotic drugs, as well as cocaine, a Schedule II controlled substance, in violation of Title 18, United States Code, Section 1791(a)(2).

3) The Fairfax County Adult Detention Center ("Fairfax ADC") in Fairfax, Virginia, within the Eastern District of Virginia, is a 1300-bed minimum-security pretrial holding facility operated by deputies of the Fairfax County Sheriff's Office ("FCSO"). Fairfax ADC accepts detainees arrested by FCSO, the Fairfax County Police Department ("FCPD"), and federal agencies. Fairfax ADC houses federal prisoners in custody pursuant to a contract or agreement with the Attorney General.

4) From in or around May 2021, and continuing through on or about June 21, 2023, Robert Theodore Sanford Jr. was employed by FCSO as a correctional officer (specifically as a deputy sheriff), working at Fairfax ADC. Sanford's duties included supervising inmates and ensuring a safe, secure prison operation.

5) From in or around January 2020, and continuing through the present, the defendant was an inmate housed at Fairfax ADC.

6) FCSO policies prohibit employees from engaging in certain conduct, including:
   a) Delivering of any message, contraband, and anything else to an inmate outside the official discharge of one's duties;
   b) Divulging information from agency records to outside sources; and

2

      c) Using their authority and position for financial gain.

## I. Trafficking of Controlled Substances and Other Contraband

7) Nevertheless, while serving as a correctional officer at Fairfax ADC, Sanford on multiple occasions between December 2022 and May of 2023 smuggled contraband to the defendant, outside of the official discharge of his duties. Further, as described in additional detail below in Section II, the defendant routinely requested, and Sanford in return disclosed, confidential, law enforcement sensitive FCSO information to the defendant to further their drug distribution and contraband smuggling schemes.

8) The contraband smuggled by Sanford to the defendant within Fairfax ADC included a cell phone; distribution quantities of fentanyl, cocaine, Suboxone; and items intended to conceal contraband from other members of FCSO, including glue and rubber gloves.

9) The defendant recruited associates of his to obtain contraband, including controlled substances, from sources of supply and deliver it to Sanford for smuggling into Fairfax ADC. These co-conspirators recruited by the defendant included UCC-1, UCC-2, and UCC-3, who had prior friendly and affectionate relationships with the defendant. Typically, the defendant directed UCC-1, UCC-2, and UCC-3 to meet with sources of supply and to thereafter meet Sanford to deliver controlled substances. The defendant further directed UCC-1, UCC-2, and UCC-3 how much, when, and how to pay bribe payments to Sanford.

10) In December 2022, Sanford smuggled a contraband iPhone into Fairfax ADC to allow the defendant and Sanford to better communicate in furtherance of the conspiracy. Thereafter, the defendant regularly communicated with Sanford on the contraband phone.

11) During the course and in furtherance of this offense, the defendant personally distributed, or it was reasonably foreseeable to him that his co-conspirators distributed, various controlled substances, the types and quantities of which amounted to at least 20 KG of converted

drug weight through the application of the Drug Conversion Tables contained in the United States Sentencing Guidelines. The specific controlled substances distributed by the defendant and others included:

   a) counterfeit oxycodone pills containing fentanyl. These pills are typically round blue pills imprinted with "M" and "30" and mimic the markings associated with pharmaceutical oxycodone 30mg pills.

   b) pharmaceutically produced Suboxone. Suboxone is a pharmaceutical combination of buprenorphine and naloxone used to treat opioid use disorder. Buprenorphine weakens intoxication from other opioids, prevents cravings and withdrawal symptoms, and allows individuals to transition from a life of addiction to a life in recovery. Suboxone is also highly diverted for abuse, in particular within prisons. Sanford and his conspirators obtained pharmaceutically produced Suboxone and repackaged it to facilitate smuggling it into prison and their distribution therein.

12) Typically, the defendant did not advertise the controlled substances provided by Sanford for sale within Fairfax ADC until multiple days had passed since a shift that Sanford was on duty in the defendant's cell block. The defendant did this so that inmates would not suspect Sanford as the defendant's source of supply.

13) The defendant recruited additional inmates within other housing locations at Fairfax ADC to assist in the distribution of controlled substances to other inmates. The defendant did this so that law enforcement's attention would not be drawn to his own housing location.

14) During the conspiracy period, the defendant and at least three co-conspirators at the defendant's direction, paid Sanford at least $1,630 in bribe payments to bring the contraband into Fairfax ADC. Typically, for each transaction, Sanford received half of the bribe payment at the time

the deal was arranged, and the second half once he received the contraband from co-conspirators in and around the Washington, DC area.

15) The defendant received at least $7,610 in proceeds from further distributing the controlled substances to other inmates.

16) It was further part of the conspiracy that Sanford obtained cocaine for distribution to persons outside of Fairfax ADC. Specifically, on at least two occasions, Sanford obtained cocaine through the defendant to distribute to women who lived and prostituted themselves and others out of an apartment that Sanford leased for these uses. Sanford offered to assist these females in posting pictures on the internet to attract clientele for paid sexual acts. Sanford bragged to the defendant regarding this venture that "I can make a mil easy."

17) For example, in or around April 2023, Sanford sourced cocaine from the defendant to distribute to one of these prostitutes. After receiving an initial sample, Sanford requested more cocaine from the defendant, noting "that shit goin to make me $$$$ I need them going like the energizer bunny."

## II.   MISUSE OF PRISON INFORMATION

18) A goal of the conspiracy included the continued success of the drug-trafficking scheme despite constant law enforcement presence at Fairfax ADC. It was therefore part of the conspiracy that the defendant and Sanford conspired to evade FCSO detection of their scheme and ensure its continued operation. This goal was accomplished in a number of ways, including:

a) The defendant routinely requested, and Sanford provided in return, confidential and sensitive law enforcement information to the defendant regarding FCSO's ongoing investigative activities within Fairfax ADC; and

b) the defendant conspired with Sanford to identify and intimidate potential informants amongst inmates within the defendant's housing location.

19) Sanford's conduct in furtherance of this goal was in violation of Sanford's sworn duties and at risk to the safety and order of Fairfax ADC.

20) On multiple occasions, Sanford provided the defendant with advance warning of upcoming investigative activities of FCSO within the prison. This included Sanford warning the defendant regarding when FCSO was conducting investigative activities, what housing units their efforts were directed at, the nature of what kinds of searches they planned to perform, and whether drug-sniffing canines were being utilized. Sanford also reported back to the defendant when FCSO investigative activities successfully discovered contraband within the prison.

21) Further, on multiple occasions the defendant conspired with Sanford to identify potential prison informants. For example, on one occasion, the defendant asked Sanford to look up how many "keep separate[s]" the defendant had in the prison's systems. "Keep separates" are a mechanism utilized by law enforcement and prisons to ensure that inmates are separated whose contact could lead to witness intimidation or potential violence. Inmates are not typically informed of who they are kept separate from, as such information could identify individuals actively cooperating against them. Sanford responded an hour after the defendant's above-referenced request with the identity of an individual who had a keep separate in place with the defendant.

22) On another occasion, the defendant asked Sanford to look up information revealing why an associate of his had gone to the "hole." Sanford thereafter revealed to the defendant that another deputy had reported on the inmate to the prison's Sheriff's Intelligence Unit (SIU). After the defendant asked if there was a report regarding the inmate's conduct, Sanford relayed "yea it is I'm looking for it now." the defendant replied, "that's important we need to know wat it say." The inmate referenced in this conversation was a customer of the drugs trafficked by Sanford and the defendant.

23) On multiple occasions, the defendant offered to intimidate potential informants and witnesses through acts of violence. For example, on one occasion Sanford warned the defendant via text message that an inmate in the defendant's housing location was "hot" because he had "dry snitched on one of the deputies." Sanford instructed the defendant "I want him down in the zoo or hole" and that "he will fuck up a whole operation." Days later the defendant updated Sanford that the inmate "gotta go easy way or da hard way" and that "my man on his ass." In response, the defendant physically assaulted the inmate, telling the defendant "I went on him yesterday look like he wanted to cry." The defendant responded "[g]ood he should be wantin to move out soon." The following day the defendant informed Sanford that the inmate had gone to medical and that the defendant had told him not to come back to the defendant's cell block. In response to learning this information, Sanford agreed to look for any reports revealing whether the inmate reported the intimidation to FCSO.

24) On another occasion, the defendant reported to Sanford that he "had to beat the shit out of" another inmate. Sanford replied asking whether the inmate had cooperated and offering to research any internal reports regarding the inmate's cooperation.

### III. DISCOVERY OF CONTRABAND BY FCSO

25) On May 4, 2023, FCSO deputies at Fairfax ADC conducted a facility search in the defendant's housing block after deputies learned from another inmate that the defendant was in possession of a cellular device and counterfeit fentanyl pills. Deputies later conducted a strip search of the defendant and discovered multiple items of contraband in the defendant's long underwear. The items included one iPhone 6s, two charging cables, one portable cellular phone charger, one USB charging brick, 92 counterfeit oxycodone pills, 174 strips of Suboxone, and over three grams of cocaine. Before this date, Sanford had smuggled the controlled substances into Fairfax ADC for

the defendant. The defendant had intended to distribute these controlled substances within Fairfax ADC.

26) On May 5, 2023, the day after the discovery of contraband on the defendant's person by FCSO, Sanford was informed of the seizure during roll call.

27) Within two weeks of FCSO discovering contraband on the defendant's person, Sanford began the process of resigning from his job at FCSO.

28) This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

29) The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

30) If the defendant breaches the plea agreement, then pursuant to the plea agreement, he waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement of facts in any such proceeding.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: June 20, 2024   By: _____
Heather D. Call
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, JAVONTE R. SMALLWOOD, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
JAVONTE R. SMALLWOOD

I am Greg Hunter, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Greg Hunter, Esq.
Attorney for Javonte Smallwood